SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.
OPINION
CHIEF JUSTICE SAYLOR
This appeal involves a proceeding in which parental rights were involuntarily terminated. Throughout the termination proceedings, up to and including the hearing on the termination petition, an attorney *1082 guardian ad litem represented the best interests of the children involved. The primary issue is whether the common pleas court erred in failing to appoint a separate attorney to represent their legal interests.
I. Background
A. In re Adoption of L.B.M.
The present appeal follows closely upon our decision in In re Adoption of L.B.M. , 639 Pa. 428, 161 A.3d 172 (2017). In that matter, this Court interpreted and applied Section 2313(a) of the Adoption Act. See 23 Pa.C.S. § 2313(a) (relating to representation in proceedings under the Adoption Act). Although multiple opinions were filed in L.B.M. , a majority of the Court agreed on several points: (a) in the context of contested termination-of-parental-rights ("TPR") proceedings, the first sentence of Section 2313(a) requires that the common pleas court appoint an attorney to represent the child's legal interests, i.e. , the child's preferred outcome;[1] (b) where there is a conflict between the child's legal interests and his best interests, an attorney-guardian ad litem (an "attorney-GAL"), who advocates for the child's best interests, cannot simultaneously represent the child's legal interests;[2] and (c) in such a circumstance, the failure to appoint a separate attorney to represent the child's legal interests constitutes structural error, meaning it is not subject to a harmless-error analysis.
While the lead opinion indicated that there must always be a separate attorney representing the child's legal interests, see L.B.M. , 639 Pa. at 442-43, 161 A.3d at 180-81 (plurality in relevant part), that portion of the opinion represented the views of three Justices - Justices Wecht, Donohue, and Dougherty. The four Justices in a responsive posture were of the view that an attorney-GAL can fill the role required by Section 2313(a), while also advancing the child's best interests, so long as there is no conflict between the child's legal interests and best interests.[3]
*1083 In terms of disposition, L.B.M. vacated the TPR decree and remanded to the trial court for further proceedings. Of the five members who supported that result, the three lead Justices did so because no separate counsel had been appointed for the children involved, thereby violating the rule they favored broadly prohibiting one attorney serving both roles in any contested TPR proceeding. See id. at 446, 161 A.3d at 183 (plurality in relevant part). The two Justices concurring in the result supported the outcome on narrower grounds, namely, that the trial court had failed to conduct a conflict analysis to determine whether the attorney-GAL could fulfill both roles in that specific case. See id. at 448, 161 A.3d at 184 (Saylor, C.J., concurring). Notably, at the time of the TPR hearing in L.B.M. , the children were four and eight years old, and the hearing transcript reflected that the eight-year-old in particular was able to articulate his feelings and beliefs about the case and respond rationally to the judge's questions concerning his preference as to the outcome of the TPR proceedings. See id. at 436, 161 A.3d at 177.
B. Factual and procedural history of this case
Turning to the present controversy, T.S. and E.S. were born to Appellant T.H.-H. ("Mother") in June 2013 and August 2014, respectively. The Allegheny County Office of Children, Youth and Families ("CYF") became familiar with Mother shortly after E.S.'s birth.
Mother admitted to using marijuana while pregnant with E.S., and she tested positive for THC (a cannabinoid) shortly after giving birth. CYF did not initially file a dependency petition, opting instead to provide services to help Mother implement her goals. However, Mother was not substantially compliant with treatment and failed to discontinue her drug use. Also, she admitted to smoking marijuana in the presence of the children, exhibited minimal parenting skills - often leaving Children in a bedroom unattended with the television "blaring," and failing to undertake basic parenting tasks such as feeding the children or changing their diapers - and did not follow through with E.S.'s medical appointments. See N.T., Feb. 3, 2017, at 8, 13-14.[4]
Beginning in January 2015, home visits were conducted by a caseworker from an independent social services agency, who helped Mother with various aspects of parenting and budgeting. On one visit, the caseworker developed concerns for the safety of the children when she observed an open oven being used to heat the residence, the presence of a cigarette lighter and a large knife where T.S. could access them, and a used condom on the floor which she believed could constitute a choking hazard. See N.T., Feb. 3, 2017, at 52-53. Although she discussed these matters with Mother, Mother downplayed their significance and generally did not appear to appreciate that they could compromise the children's safety.
In July 2015, a CYF caseworker made an unannounced visit and noticed that the home smelled of marijuana and Mother was under the influence of drugs or alcohol. Because CYF believed it could no longer ensure the safety of the children in Mother's care, it sought an emergency custody authorization and the children were removed that day. They were adjudicated dependent and placed with foster parents. For the placement and permanency review period that followed, the court appointed KidsVoice (a child-advocacy organization in *1084 Pittsburgh) to represent the children's best interests and legal interests in compliance with Section 6311 of the Juvenile Code. See 42 Pa.C.S. § 6311 ; Pa.R.J.C.P. 1154.
After the foster care placement, Mother's court-ordered goals were, inter alia , to participate in drug and alcohol treatment (which included random urine screens), mental health treatment, and parenting classes, and to visit her children and maintain contact and cooperation with CYF. The court appointed Beth Bliss, Psy.D., a licensed forensic psychologist, to conduct evaluations. Dr. Bliss evaluated Mother individually and performed interactional evaluations between the children and Mother, and between the children and their foster parents.[5]
In late 2016, CYF filed a petition to terminate Mother's parental rights, which Mother contested.[6] The court held a hearing on the petition on February 3, 2017. At the hearing, CYF was represented by Melaniesha Abernathy, Esq.; Mother was represented by Kiersten Frankowski, Esq., of the Allegheny County Bar Foundation's Juvenile Court Project; and, as reflected on the hearing transcript and the TPR docket sheet, the children were represented by Cynthia J. Moore, Esq., from KidsVoice. The orders appointing KidsVoice to represent the children in the dependency proceedings stated it was to represent their legal and best interests, and it is undisputed that this dual function carried over into the termination proceedings. Thus, the children had continuity of representation between the dependency and TPR proceedings. However, no independent counsel represented solely the children's legal interests in the latter proceedings.
The CYF caseworker, the ACHIEVA employee, and Dr. Bliss were among the witnesses called by CYF. According to their testimony, Mother was inconsistent or non-compliant with most of the treatment programs to which CYF referred her - including dual-diagnosis (i.e. , mental health and substance abuse) treatment - and had difficulty providing clean urine screens, see N.T., Feb. 3, 2017, at 10-11; she was unable to understand or manage the needs of both children simultaneously during supervised visits, including their safety needs, see id. at 13, 31, 36, 39, 64; see generally id. at 37 (reflecting the ACHIEVA worker's assessment that Mother "would need 24/7 supports if she were alone with the children"); and she only minimally complied with the court's permanency plan, see id. at 31. More generally, the conditions leading to the children's removal had not been remedied, nor were they likely to be within a reasonable timeframe. See, e.g. , id. at 24. In foster care, moreover, T.S.'s speech and overall behaviors "improved greatly," and E.S.'s feeding problems resolved. Id. at 21. The CYF caseworker expressed that it would be best for the children to remain with the foster parents and ultimately to be adopted by them. See id. at 24.
Dr. Bliss testified that Mother did not prioritize being a parent, as she missed numerous visits with the children because she had "other things she had to do," id. at 72, and she continued to use drugs although she was aware such conduct would negatively impact the likelihood of reunification. Dr. Bliss also expressed that, *1085 whereas the children were indifferent to Mother's presence in the visiting room and did not seem bonded with her, they appeared emotionally bonded with their foster parents. In this respect, Dr. Bliss stated that T.S. repeatedly sought attention from his foster mother, referred to the latter as "Mommy," and showed her physical affection. Further, according to Dr. Bliss, the foster parents were effective in attending to the children's needs, providing them with affection, and promoting developmentally appropriate skills.[7] Dr. Bliss opined to a reasonable degree of psychological certainty that the children would not suffer any harm from not seeing Mother again, and she recommended that the current foster placement continue. See id. at 78-79.
Later that day, the court granted the petition, finding that CYF had established by clear and convincing evidence grounds for termination under paragraphs (2), (5), and (8) of Section 2511(a) of the Adoption Act, see 23 Pa.C.S. § 2511(a)(2), (5), (8),[8] and that termination would serve the children's needs and welfare. See id. § 2511(b) (providing that, in terminating parental rights, the court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child").
While Mother's appeal to the Superior Court was pending, this Court decided L.B.M. on March 28, 2017.[9] Accordingly, in her appellate brief Mother claimed for the first time that the children should have been represented by appointed counsel separate from the GAL at the termination proceeding.[10] Mother argued that the trial court's failure to appoint such counsel constituted *1086 structural error, thereby entitling her to a new TPR proceeding. Mother also maintained that her failure to raise the issue previously should be excused because this Court had not yet ruled in L.B.M. at the time of the February 3, 2017, hearing.
In a supplemental brief, the GAL argued that, under the Superior Court's interpretation of L.B.M . in In re D.L.B. , 166 A.3d 322 (Pa. Super. 2017), a guardian ad litem may serve as legal counsel for a child in an involuntary TPR proceeding as long as the child's legal interests and best interests are not in conflict.[11] The GAL asserted that no such conflict had been identified here. In response, Mother did not contend that the children's best interests and legal interests were in conflict. Rather, she argued that the D.L.B . panel had misapprehended L.B.M. , which, she argued, requires the appointment of independent legal counsel for children in every involuntary TPR proceeding.
A three-judge panel of the Superior Court affirmed in an unpublished decision. The panel observed that, regardless of Mother's suggestion that D.L.B. was wrongly decided, D.L.B. represented binding precedent which the panel was not at liberty to overrule. See In re T.S. , Nos. 364 & 365 WDA 2017, slip op. at 5, 2017 WL 3669504, at *2 (Pa. Super. Aug. 25, 2017). The court noted that, per D.L.B. 's analysis, L.B.M. does not require appointment of independent legal counsel for a child in a contested TPR proceeding unless the child's legal and best interests conflict. See id. (citing D.L.B. , 166 A.3d at 329 ). The court ultimately concluded that a remand was unnecessary as Mother did not argue that the children's legal and best interests were in conflict and, in the court's view, the record did not indicate that any such conflict existed. See id.[12]
We granted further review to determine whether the common pleas court erred in failing to appoint separate counsel to represent the children's legal interests pursuant to Section 2313(a), 23 Pa.C.S. See In re T.S. , --- Pa. ----, 173 A.3d 266 (2017) (per curiam ).
II. Waiver
CYF and the GAL both maintain that Mother waived the issue of whether the common pleas court should have appointed a separate attorney to represent the children's legal interests by waiting until her appeal to raise it.[13] See Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). They argue the timing of this Court's L.B.M. decision is immaterial since the separate-counsel requirement is alleged to be based on Section 2313(a), which was extant long before L.B.M. was decided. Mother counters that failure to appoint counsel to represent a *1087 child's legal interests at a contested TPR hearing is not subject to waiver because it constitutes structural error. See Brief for Appellant at 21.
Mother's focus solely on structural error does not resolve the waiver question without further analysis (which she does not provide). First, and as noted, structural error means that no harmless-error analysis is relevant; however, it does not always imply non-waivability. Accord Weaver v. Massachusetts , --- U.S. ----, 137 S.Ct. 1899, 1910, 198 L.Ed.2d 420 (2017) ; see, e.g. , Commonwealth v. Rega , 620 Pa. 640, 657, 70 A.3d 777, 786-87 (2013) (observing that a violation of the right to a public trial "is a particular type of structural error which is waivable" (citations omitted) ); cf. Freytag v. Comm'r of Internal Revenue , 501 U.S. 868, 896, 111 S.Ct. 2631, 2648, 115 L.Ed.2d 764 (1991) (Scalia, J., dissenting) (positing that non-waivability is more closely aligned with jurisdictional defects than with whether an error is structural). See generally Commonwealth v. Martin , 607 Pa. 165, 218, 5 A.3d 177, 208-09 (2010) (Saylor, J., concurring) (surveying jurisdictions and discussing policy concerns).
Nevertheless, we conclude this particular type of alleged error is non-waivable. The statutory right under Section 2313(a) belongs to the child, not the parent. Accord In re E.F.H. , 751 A.2d 1186, 1189 (Pa. Super. 2000). There was no attorney representing solely the children's legal interests who could have raised their rights in the trial court, and the children plainly could not have done so themselves. See In re K.J.H. , 180 A.3d 411, 413 (Pa. Super. 2018) ("Child, due to his minority and lack of representation in the orphans' court, could not raise this issue himself."); cf. Pa.R.J.C.P. 1152(A)(2) (stating minors can waive counsel in dependency cases only if the waiver is knowing, intelligent, and voluntary, and the court conducts a record colloquy). We conclude, then, that the failure of any party, including Mother, to affirmatively request separate counsel for the children cannot have constituted waiver. Accordingly, the substantive question on which we granted review is properly before the Court. We now turn to that issue.
III. Dual-role representation
When reviewing an order granting or denying termination of parental rights, we accept factual findings and credibility determinations supported by the record, and we assess whether the common pleas court abused its discretion or committed an error of law. See In re D.C.D. , 629 Pa. 325, 339-40, 105 A.3d 662, 670-71 (2014). We resolve all questions of law de novo. See id.
Mother has abandoned her original challenge to the county court's exercise of its discretion, see supra note 12, and instead asserts that the Superior Court erred in not recognizing that L.B.M. required it to remand this matter to the trial court for a new termination proceeding at which the children's legal interests would be represented by appointed counsel. She structures her advocacy in terms of rebutting what she perceives as three erroneous assumptions made by the D.L.B. court. See Brief for Appellant at 13.[14] We address them in turn.
*1088 A. Prevailing law
First, Mother asserts D.L.B . wrongly assumed that counsel appointed pursuant to Section 2313(a) may represent a child's best interests. She states that, in L.B.M. , the three-Justice plurality, joined by the concurrence, agreed that Section 2313(a) requires that the legal interests of the child be represented, and further, that the appointment of counsel is a necessary measure to ensure such representation occurs. See Brief for Appellant at 14-17. She concludes by suggesting that a majority of the L.B.M . Court disapproved the concept that Section 2313(a) counsel can ever represent a child's best interests. See id. at 17-18.
As developed above, four Justices in L.B.M . agreed that, where a child's legal and best interests do not diverge in a termination proceeding, an attorney-GAL representing the child's best interests can also fulfill the role of the attorney appointed per Section 2313(a) to represent the child's legal interests. See supra note 3.[15] This majority view of the Justices was apparent from the face of the opinions in L.B.M. , as the Superior Court has recognized on multiple occasions. See D.L.B. , 166 A.3d at 329 ; In re Adoption of T.M.L.M. , 184 A.3d 585, 588 (Pa. Super. 2018).
Furthermore, all four Justices in a responsive position indicated that, where a child is too young to express a preference, it would be appropriate for the GAL to represent the child's best and legal interests simultaneously. See L.B.M. , 639 Pa. at 448, 161 A.3d at 184 (Saylor, C.J., joined by Todd, J., concurring); id. at 461, 161 A.3d at 192 (Mundy, J., joined by Baer, J., dissenting). Although that circumstance was not before the L.B.M . Court, we now expressly reaffirm these legal principles in the context of the present case, as they are material to the result. See generally Pap's A.M. v. City of Erie , 553 Pa. 348, 357, 719 A.2d 273, 278 (1998) (explaining that a holding arises from a fragmented decision when a majority of Justices are in agreement on the legal point at issue), rev'd on other grounds , 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). Therefore, we disagree with Mother's contention that L.B.M . reflects "prevailing case law of the Commonwealth" that an attorney-GAL representing the child's best interests can never satisfy the mandate embodied in the first sentence of Section 2313(a), Brief for Appellant at 17, and that D.L.B. 's"assumption" along these lines was incorrect.
B. Presumption for non-communicative *1089 children[16]
Next, Mother addresses the presumed legal interests of a child who cannot communicate information relevant to termination proceedings. She does not claim that the children in this case would have been able meaningfully to express their preferred outcome or otherwise direct counsel's representation of their legal interests. Rather, she agrees the children would not have been able to do so and states that, therefore, "the question is what presumption should be made about the child's legal interest, i.e. , their preferred outcome, when the child is nonverbal or unable to satisfactorily verbalize their preferred outcome." Brief for Appellant at 23. Mother contends that the Superior Court assumed there can be no conflict of interest between the child's best and legal interests in such circumstances. She argues that such assumption was in error. Instead, she maintains, the child should be presumed as a matter of law to oppose termination - thereby creating a conflict whenever the GAL believes that termination would be in the child's best interests.
The parties agree that, due to the children's very young age (two and three years old), they cannot have formed a subjective, articulable preference to be advanced by counsel during the termination proceedings, and this is entirely consistent with the record.[17] It follows that the legal interests to be represented by Section 2313(a) counsel - which, again, are synonymous with the child's preference, see In re L.B.M. , 639 Pa. at 432, 161 A.3d at 174 - were not ascertainable during the termination proceedings. The question then becomes whether the requirement of Section 2313(a), that counsel be appointed to "represent the child" in a contested TPR proceeding, can be deemed to have been fulfilled by an attorney-GAL who has already been appointed and is present in those proceedings, advocating for the child's best interests (which may be denial of the TPR petition, depending on the facts of the case).
The statute does not provide a clear answer to this question, as it does not expressly contemplate the circumstance that the child's wishes cannot be ascertained. We therefore look for guidance to the analogous provision of the Juvenile Act, which does contemplate that situation. Section 6311 of the Juvenile Act initially states that the guardian ad litem is to "represent the legal interests and the best interests of the child." 42 Pa.C.S. § 6311(a). It then specifies that the guardian ad litem must "[a]dvise the court of the child's wishes to the extent that they can be ascertained and present to the court whatever evidence exists to support the child's wishes." 42 Pa.C.S. § 6311(b)(9) (emphasis added).[18] By straightforward implication, if the wishes of the child cannot be ascertained, *1090 the GAL has no duty to "advise the court" of such wishes. For purposes of the proceeding, such wishes do not exist. That is not merely a legal fiction. As explained above, it comports with reality to the extent any participant in the proceedings can discern it. Moreover, and contrary to Mother's argument, it would be tenuous to simply presume a particular preference by the child as a matter of law.
Such a circumstance does not negate the mandate of Section 2313(a) that counsel be appointed to "represent the child" in contested TPR proceedings. It does, however, bear on the question of whether a conflict arises if the trial court allows the attorney-GAL to fulfill that mandate. As a matter of sound logic, there can be no conflict between an attorney's duty to advance a subjective preference on the child's part which is incapable of ascertainment, and an attorney's concurrent obligation to advocate for the child's best interests as she understands them to be. Thus, we conclude that where an attorney-GAL is present in such proceedings undertaking the latter task (advocating for the child's best interests), Section 2313(a) does not require the appointment of another lawyer to fulfill the former (advancing the child's unknowable preference).[19]
Mother disagrees with the above based on her contention that, in the case of a pre-verbal child, the law should indeed presume a preference on behalf of the child, and that it should presume the child opposes termination. Mother rests her argument in this regard on certain passages from the Supreme Court's decision in Santosky v. Kramer , 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). See Brief for Appellant at 23-25.
In Santosky , the Court reviewed a New York State statute which bifurcated termination proceedings into two phases: a fact-finding phase designed to ascertain whether the parent was unfit - or, in the words of the statute, the child was "permanently neglected" - and a dispositional phase to determine what placement would serve the child's best interests. See Santosky , 455 U.S. at 748, 102 S.Ct. at 1392. The second phase would only be reached if the parent was found to be unfit at the conclusion of the first phase. Under the New York enactment, the party petitioning for termination could prevail in the fact-finding phase through proof of parental unfitness by a fair preponderance of the evidence. The question before the Court was whether that relatively low evidentiary standard satisfied due process. The Court held that it did not and that, in view of the nature of a parent's right to her natural children, proof by at least clear and convincing evidence was constitutionally required. See id. at 769, 102 S.Ct. at 1403. Mother notes that, in rejecting the preponderance-of-the-evidence *1091 standard, Santosky indicated that "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship," and that in this phase the state cannot simply assume that a child and his parents are adversaries. Id. at 760, 102 S.Ct. at 1398.
However, it is important to recognize the context in which these statements were made. The Supreme Court's entire discussion related to how the risk of erroneous fact-finding should be allocated as between the state and the parent. The Court first recognized that, under due process, the function of a standard of proof is to allocate the risk of error between competing parties through consideration of the comparative loss each would suffer as a result of erroneous fact-finding. The Court recited the well-known concept that the preponderance-of-the-evidence standard applies in civil disputes over money damages because society has only a minimal interest in the outcome and, in fairness, the litigants should share the risk of error equally. On the other hand, the majority observed, when the government initiates criminal proceedings to deprive an individual of life or liberty, the beyond-a-reasonable-doubt standard obtains because of the severe consequences to the individual and the substantial societal loss occasioned when an innocent person is imprisoned. See id. at 755-58, 102 S.Ct. at 1395-97 ; see also Commonwealth v. Maldonado , 576 Pa. 101, 109, 838 A.2d 710, 715 (2003) (discussing the function of the various standards of proof in similar terms). Turning to a state-initiated petition under New York law, the Court concluded that an erroneous finding of permanent neglect would result in a more significant loss than an erroneous finding of parental fitness. See Santosky , 455 U.S. at 761, 102 S.Ct. at 1399. Given this "disparity of consequence," id. , the Court concluded that clear and convincing evidence of parental unfitness was constitutionally necessary.
When viewed in this context, it is evident that the Court's expressions about the child's interest were made solely to emphasize that the proceeding is a contest between the state and the parent, and not one in which equal but opposite interests of the parent and child are pitted against each other. See id. at 759, 102 S.Ct. at 1398 (explaining that the fact-finding phase under New York law is not intended to "balance the child's interest in a normal family home against the parents' interest in raising the child," but instead, it "pits the State directly against the parents"). Along these lines, the Court clarified that, although the child and his foster parents may be "deeply interested in the outcome of the contest," at the fact-finding phase "the focus emphatically is not on them." Id. ; see also id. at 761, 102 S.Ct. at 1399 ("Since the factfinding phase of a permanent neglect proceeding is an adversary contest between the State and the natural parents, the relevant question is whether a preponderance standard fairly allocates the risk of an erroneous factfinding between these two parties. " (emphasis added) ). That being the case, as long as trial courts require the state to prove parental unfitness - or, under Pennsylvania's law, grounds for termination, see 23 Pa.C.S. § 2511(a) - by at least clear and convincing evidence, the child's status as a non-adversary has been folded into the analysis and the Due Process Clause is satisfied.
Notably, the question of what a very young, pre-verbal child's legal interests should be presumed to be within proceedings that satisfy due process was not before the Santosky Court.[20] Further, the *1092 Court did not indicate that such a child is deemed to have a constitutionally protected interest in remaining with his natural parents, and its emphasis that the proceeding only involves the parents' and the state's respective interests contradicts any such precept. If this were not so, moreover, it would call into question whether due process requires proof by clear and convincing evidence in circumstances where an older, verbal child directs his attorney to advocate in favor of termination. Santosky cannot reasonably be understood to suggest that due process would permit the state to prove its case by a less exacting evidentiary standard in that situation - again, because the Supreme Court's focus was not on the child's legal interests, but on those of the parent.
In light of the above, when the passages of Santosky on which Mother relies are understood in their context, they do not undermine our conclusion that it would be inadvisable for us to impose a legal presumption as to the preferred outcome of a child who is too young to formulate a subjective, articulable preference.
C. Presumption that harmless-error analysis can be used
Finally, Mother maintains D.L.B . wrongly assumed that a post-hoc appellate conflict analysis can be performed to assess whether the failure to appoint Section 2313(a) counsel was error. She notes that failure to appoint counsel as required constitutes structural error and posits that a remand for the appointment of counsel is always necessary due to the nature of the child's rights, as the intermediate court previously recognized in In re Adoption of G.K.T. , 75 A.3d 521 (Pa. Super. 2013). See Brief for Appellant at 20.
To the extent Mother indicates that structural error is not subject to harmless error analysis, by definition she is correct. However, structural error cannot arise unless the trial court erred. While a majority of the L.B.M. Court agreed that the error under review was structural, the children in that matter were able to express their thoughts concerning whether they wanted to stay with their natural parent. Here, by contrast, and as developed above, the children were too young to have had any such capability. We have determined an attorney-GAL who is present and representing a child's best interests can properly fulfill the role of Section 2313(a) counsel where, as here, the child at issue is too young to be able to express a preference as to the outcome of the proceedings. Thus, the trial court did not err in allowing KidsVoice, the children's guardian ad litem , to act as the sole representative for T.S. and E.S. Moreover, G.K.T . is distinguishable in that, although the child in that case was very young and pre-verbal, no attorney represented the child at all.
IV. Conclusion
In sum, we hold that a child's statutory right to appointed counsel under Section 2313(a) of the Adoption Act is not subject to waiver. We additionally reaffirm certain principles agreed upon by a majority of Justices in L.B.M ., namely, that during contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian ad litem representing the child's best interests can also represent the child's legal interests. As illustrated by the present dispute, moreover, if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed "to represent *1093 the child," 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-guardian ad litem who represents the child's best interests during such proceedings.
For the reasons given, we affirm the order of the Superior Court.
Justices Baer, Todd and Mundy join the opinion.
Justice Dougherty joins Parts I and II of the opinion, as well as the mandate, and files a concurring opinion.
Justice Donohue files a concurring and dissenting opinion.
Justice Wecht files a dissenting opinion.

That provision states:
(a) Child. -The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.
23 Pa.C.S. § 2313(a).

The difference between legal interests and best interests is summarized in a comment to a rule governing the GAL's duties in dependency matters:
"Legal interests" denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation. "Best interests" denotes that a guardian ad litem is to express what the guardian ad litem believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees.
Pa.R.J.C.P. 1154, cmt., quoted in L.B.M. , 639 Pa. at 431 n.2, 161 A.3d at 174 n.2.

See id. at 447-48, 161 A.3d at 184 (Saylor, C.J., concurring, joined by Todd, J.) ("[T]he propriety of permitting the same individual to serve in both capacities should be determined on a case-by-case basis, subject to the familiar and well-settled conflict of interest analysis."); id. at 455, 161 A.3d at 188-89 (Baer, J., dissenting, joined by Mundy, J.) ("Section 2313(a), in my view, does not mandate the appointment of counsel distinct from the GAL Attorney serving in the same dual capacity in the dependency proceedings, absent a conflict of interest between the child's best interests and legal interests."); id. at 459, 161 A.3d at 191 (Mundy, J., dissenting, joined by Baer, J.) (concluding that, per the applicable court rules, an attorney GAL can represent the best interests and legal interests unless there is a conflict of interest).

Both children had special needs. T.S. had speech delays and severe tantrums, and E.S. had feeding problems. See id. at 21.

Separately, Mother was referred to ACHIEVA due to an intellectual disability. According to the record, the ACHIEVA program in which Mother took part supports parents with an IQ score of 70 or below. See N.T., Feb. 13, 2017, at 33.

The petition also sought termination of the biological father's parental rights. His rights were terminated and he has not appealed. Only the mother's appeal is before us.

The bond with the foster parents was corroborated by the CYF caseworker. See id. at 22. Still, the ACHIEVA employee did report observing affection between Mother and her children during at least some of the visits she supervised. See id. at 40.

That provision states, in relevant part:
(a) General rule. -The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
* * *
(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent
* * *
(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
* * *
(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
23 Pa.C.S. § 2511(a)(2), (5), (8).

On May 23, 2017, we filed revised opinions in L.B.M. clarifying which parts of the lead opinion reflected the views of a majority of the Court. See L.B.M. , 639 Pa. at 432 n.1, 161 A.3d at 174 n.1. The timing of those clarifications in relation to the parties' Superior Court filings is not material to this appeal.

In her Rule 1925(b) statement, Mother had only challenged the trial court's ruling that that the children's needs and welfare would be best served, for purposes of Section 2511(b), by terminating her rights. See 23 Pa.C.S. § 2511(b).

D.L.B. was decided in mid-June 2017, after the Superior Court briefing schedule had closed. The intermediate court granted the parties' request to file supplemental briefs addressing the impact of D.L.B on the present case.

The panel separately held that the county court did not err in concluding that termination of her parental rights would best serve the children's needs and welfare pursuant to Section 2511 of the Adoption Act. See id. at 8-9, 2017 WL 3669504, at *4. Mother has not challenged that aspect of the Superior Court's decision.

The GAL filed her brief on behalf of the children inasmuch as she has served as their counsel throughout these proceedings. In light of the substantive issue in this appeal, however, and for the sake of clarity, where the GAL's advocacy is concerned we depart from our usual custom of attributing arguments to the party. Cf. Commonwealth v. Wright , 621 Pa. 446, 456 & n.9, 78 A.3d 1070, 1076 & n.9 (2013) (citing cases and departing from such custom where counsel's and the party's positions were at odds).

A joint amicus brief supporting Mother's position was submitted by Professor Kara R. Finck of the University of Pennsylvania Law School, together with the following organizations: Juvenile Law Center; American Civil Liberties Union of Pennsylvania; Community Justice Project; Community Legal Services, Inc.; National Association of Counsel for Children; National Coalition for a Civil Right to Counsel; and Pennsylvania Legal Aid Network (collectively, the "Amici for Reversal").
A joint amicus brief supporting CYF and the GAL was submitted by Professor Lucy Johnston-Walsh of the Penn State Dickinson School of Law, together with the following organizations: Support Center for Child Advocates; Defender Association of Philadelphia; and Dauphin County Social Services for Children & Youth (collectively, the "Amici for Affirmance").

The GAL highlights Justice Baer's observations that termination proceedings often arise from dependency proceedings, and continuity of representation can be beneficial. See L.B.M. , 639 Pa. at 454, 161 A.3d at 188 & n.6 (Baer, J., dissenting). She proffers that, where no conflict exists, requiring two attorneys to represent the child would impose unnecessary financial burdens on public agencies. See Brief for Appellees at 25; accord Brief for Amici for Affirmance at 22 ("[T]he Pennsylvania counties that would be asked to pay for separate Section-2313(a) lawyers are and are likely to remain in difficult financial condition with a great many critical needs vying for terribly limited resources. It is one thing to impose expense on those budgets ... when there is a conflict; it is quite another to impose that expense when neither the law nor the facts ... suggest such a conflict."); cf. id. at 17-18 (asserting that since L.B.M. was decided, amicus Defender Association has litigated approximately 200 TPR petitions where the court appointed separate counsel, and in virtually every case there has been no conflict between the GAL's and counsel's respective positions).

We have reversed the order of Mother's second and third arguments for ease of discussion.

Conversely, Pennsylvania's Rules of Professional Conduct refer to "children as young as five or six years of age ... having opinions which are entitled to weight in legal proceedings concerning their custody." Pa.R.P.C. 1.14, Explanatory Comment 1.

The third sentence of paragraph (b)(9) - which provides that no conflict of interest arises from a difference between the child's wishes and the GAL's needs-and-safety recommendation as to the child's placement and services - has been suspended insofar as it "is inconsistent with [Juvenile Court] Rules 1151 and 1154, which allows for appointment of separate legal counsel and a [GAL] when the [GAL] determines there is a conflict of interest between the child's legal interest and best interest." Pa.R.J.C.P. 1800(3) ; see L.B.M. , 639 Pa. at 433 n.4, 161 A.3d at 175 n.4.

Mother observes there was no order appointing the dependency GAL as GAL for the termination proceedings. See Reply Brief for Appellant at 1. However, she concedes that Attorney Moore "verbally" entered her appearance as GAL at the time of the hearing. Brief for Appellant at 20. She has also explained that, as a matter of local custom in Allegheny County, the GAL appointed for dependency proceedings "automatically" represents the same dependent child in any follow-on involuntary TPR proceedings. In re T.S. , Nos. 364 & 365 WDA 2017, 175 A.3d 1118 (Pa. Super.), Appellant's Reply to Supplemental Argument at 5 n.1 (filed July 20, 2017).
It would be a better practice for the court to place an order on the record formalizing the GAL's role for termination purposes. See L.B.M. , 639 Pa. at 454, 161 A.3d at 188 (Baer, J., dissenting). Nevertheless, we are disinclined to elevate form over substance. See id. ; cf. Commonwealth v. D'Amato , 579 Pa. 490, 517-18, 856 A.2d 806, 822 (2004) (holding that, where a lawyer who had not entered his appearance pursuant to the criminal procedural rules effectively represented a defendant during a critical stage of trial, the technical defect did not deprive the defendant of his right to counsel).

Pennsylvania's proceedings satisfy due process as set forth in Santosky , as the grounds for termination must be proved by clear and convincing evidence. See In re T.R. , 502 Pa. 165, 166-68, 465 A.2d 642, 642-43 (1983) ; In re T.S.M. , 620 Pa. 602, 628, 71 A.3d 251, 267 (2013).